UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DELUXE BUILDING SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CONSTRUCTAMAX, INC., et al.,<br><br>Defendants. | Civ. No. 2:06-cv-02996<br>(KM)(MAH)<br><br>MEMORANDUM OPINION<br>AND ORDER ON CERTAIN<br>MOTIONS *IN LIMINE*<br>[ECF Nos. 417, 419, 420, 421,<br>422, 424, 425, 426, 428.] |

There are twelve motions *in limine* pending in this matter. Seven were filed by Whitlock and the Agency; four were filed by Arch and Cmax; one was filed by Deluxe. The complexity of this case and the sheer number of motions tend to weigh against the usual course of delaying rulings until the eve of trial, or even of reading evidentiary rulings from the bench. Hence, in lieu of oral rulings, I file this informal, unpublished opinion for the guidance of the parties.

Of the twelve *in limine* motions, this opinion decides nine: Docket Nos. 417, 419, 420, 421, 422, 424, 425, 426, and 428. I have deferred decision on three of the motions: Docket nos. 418, 423, and 427.

**Motions *in limine* filed by Whitlock and the Agency:**

### 1) Motion to Exclude as Irrelevant Evidence Relating to Duties Owed by Whitlock to Third Parties (Docket No. 419)

Whitlock/Agency seek to bar Arch/Cmax from offering expert opinion testimony that Whitlock breached (a) duties that Whitlock owed to its lender (the Agency) under the loan documents; and (b) statutory duties that Whitlock owed to Jersey City. Such evidence, they say, fails to meet the minimal standard of relevance under Fed. R. Evid. 401 and is therefore inadmissible under Fed. R. Evid. 402. According to Whitlock and the Agency, because these duties are owed to third parties, and not to Cmax or Arch, any breach of such duties by Whitlock has no bearing on this action.

1

Rule 401 defines evidence as "relevant" if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Here, the issue being tried is the amount of damages resulting from the breach of contract by Arch/Cmax. (The breach itself has already been established on summary judgment.) Arch/Cmax contend that the damages for which they are responsible should be reduced because Whitlock contributed to the harm by breaching duties that Whitlock owed to third parties, the Agency and Jersey City.

This meets the minimal standard of Rule 401 relevance. It might be, for example, that Whitlock was legally or contractually responsible for acquiring the requisite permits (a disputed issue). If so, then notwithstanding the breaches by Arch/Cmax, it is possible that Whitlock's failure to secure such permits contributed to its damages. I cannot say that evidence that Whitlock contributed to the delays and damages by breaching duties it owed to third parties is irrelevant to the amount of damages attributable to Arch and Cmax.

The motion is therefore denied.

### 2) **Motion to Preclude Certain Expert Testimony of L. Lee Schumacher (Docket No. 421)**

Whitlock/Agency move to preclude certain expert testimony of L. Lee Schumacher. This motion concerns the calculation of liquidated damages. The construction contract provides that Arch/Cmax will be responsible for paying liquidated damages in the amount of $7,775 per day for every day that the project is not completed after June 24, 2006. Those liquidated damages will *not* be assessed, however, for periods of "excusable delay" – defined as any period of delay that Arch/Cmax can demonstrate was caused by some other party. The other party that Arch/Cmax blame for the delay is Whitlock itself.

Such "excusable delay," attributable to Whitlock, would in effect grant Cmax/Arch an extension of the project completion deadline. Such a third-party delay will extend the deadline, however, only "if said delay affects Project Completion beyond the time set forth" in the construction contract. Construction Contract, Art. 28. That is, Arch/Cmax are absolved only by virtue of actions of Whitlock that in fact "delayed Project Completion." Whitlock contends that certain of its acts, even if they caused delays, did not in fact affect the project completion date. Thus Whitlock/Agency, in this motion, seek to preclude Arch/Cmax's scheduling delay expert, L. Lee Schumacher, from testifying that certain delays caused by Whitlock (i.e., those that did *not* delay

Project Completion) excuse Arch and Cmax from their obligation to pay liquidated damages.

Whitlock's distinction between delays that did or did not affect the completion date is premised on another distinction: the distinction between delays to the "critical path" and delays of non-critical activity. The critical path method ("CPM") has been defined as follows:

> [CPM] is a standard construction device used to plan the activities of a construction project in a logical, orderly sequencing manner citing durations for the different activities from the beginning of the job to the end. A CPM is created by dividing the entire project into discrete and quantifiable steps; in turn, each step is allotted an estimated time for completion.

5 Bruner & O'Connor Construction Law § 15:5. "Many subcontractor projects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise the entire project will be delayed. These latter items of work are on the 'critical path.'" *Haney v. U.S.*, 230 Ct. Cl. 148, 676 F.2d 584, 595 (1982). The former, *non*-critical path activities entail more flexibility. These can be delayed without affecting the project's completion date; they are said to have "float." 5 Bruner & O'Connor Construction Law § 15:9.

I agree with Whitlock and the Agency that CPM is an accepted methodology for organizing a complex project and that it may be used as a tool to determine whether a claimed delay affected the completion date. Under that CPM methodology, the task is to determine whether a claimed delay affected an activity that was on the critical path. *See* 5 Bruner & O'Connor Construction Law § 15:42; *G.M. Shupe, Inc. v. U.S.*, 5 Cl. Ct. 662, 32 Cont. Cas. Fed. (CCH) ¶72712 (1984) ("[O]nly construction work on the critical path had an impact upon the time in which the project was completed."); *see also R.P. Wallace, Inc. v. U.S.*, 63 Fed. Cl. 402, 409 (2004) ("[T]he decision of law is well-settled that when a contractor is seeking extensions of contract time for changes and excusable delay, which will relieve it from the consequences of having failed to complete the work within the time allowed for performance, it has the burden of establishing by a preponderance of the evidence not only the existence of an excusable cause of delay but also the extent to which completion of the contract work as a whole was delayed thereby."); Wickwire and Ockman, *Use of Critical Path Method on Contract Claims*, 19 Constr. Law. 12, 13 (Oct. 1999)

("The advantage of a critical path network analysis is that it allows both parties to the contract during construction—and the fact finder during analysis of delays—the ability to discriminate between critical and noncritical delays, even in the context of concurrent delays.").

In opposition, Arch/Cmax focus on competing methodologies for evaluating concurrent causes of delay. Schumacher's methodology makes no bright-line distinction between critical-path and non-critical activities. And, say Arch/Cmax, he should be permitted to testify as to the concurrent effect of delays that occur within the same analysis period (the Functional Theory), as opposed to delays that are precisely contemporaneous (the Literal Theory).

Those methodological distinctions aside, Schumacher does appear to focus on the correct issue: whether the project as a whole was delayed. *See* Deposition Transcript of L. Lee Schumacher, at 31-32 ("To me if there is a *delay to the project*, that's a delay. Even if it's on a path that's near critical, near critical or maybe even not near critical, *if it would have delayed the project anyway*, it doesn't have to be on the critical path.") And even the authorities cited by Whitlock and the Agency seem to concede the validity of a somewhat less categorical adherence to CPM. *See Weaver-Bailey Contractors, Inc. v. United States*, 19 Cl. Ct. 474, 481 (1990) (giving examples and concluding that "regardless of whether an activity is on the critical path of a project, if the time required to complete the activity is greater than the time remaining to complete the project, then project completion will be delayed").

To be sure, the CPM methodology has a certain plausibility. Such methodological disputes, however, are the ordinary stuff of battles of the experts at trial. Whitlock/Agency may attack Schumacher's opinion on the basis of the CPM methodology, as explicated by their own expert. On cross-examination, for example, Whitlock is free to ask Schumacher to explain how a delay in an activity with "float" can be said factually to have delayed the completion of the project. But even if I could say beforehand that such cross-examination would be devastating – and I cannot at this stage say that – it would not be a basis for excluding all expert testimony that is not narrowly confined to the CPM methodology.

Schumacher will be permitted to offer his expert opinion that delays attributable to Whitlock in fact delayed "Project Completion." I will not, however, confine him to the CPM methodology as Whitlock/Agency suggest.

### 3) Motion to Preclude Evidence of Conviction Pursuant to Fed. R. Evid. 609(b) (Docket No. 422)

John Saracco is the principal of John Saracco Architects ("JSA"), which worked on the Whitlock Mills project. Fourteen years ago, Mr. Saracco pled guilty to the misdemeanor crime of offering a false instrument for filing. Whitlock and the Agency have moved to prevent Arch and Cmax from offering testimony or other evidence of this conviction.

Under Rule 609(b), Fed. R. Evid., evidence of Saracco's conviction is presumptively inadmissible because it is more than ten years old. To obtain its admission, Arch/Cmax would have to demonstrate that the probative value of the conviction substantially outweighs its prejudicial effect. They point out, correctly, that the knowing submission of a false document is a crime of falsehood. The conviction, however, occurred fourteen years ago. This misdemeanor conviction would taint Saracco's entire testimony, but, given its age, it would have slight probative value as to Saracco's current credibility. In short, the prejudicial effect of a criminal conviction is likely to have an effect on the jury that is not substantially outweighed by its probative value.

On the subject of probativeness, I note also that the impeachment, or not, of Saracco's credibility probably is not central to any party's proofs at trial. This is a breach of contract case in which liability has already been determined and the remaining issues center around damages. Saracco's testimony will principally relate to the design and construction of the project. Much of it will probably be cumulative of the project documents and the correspondence among the parties, which will be the primary evidence on these issues.

The motion to exclude evidence as to Mr. Saracco's prior conviction is granted.

### 4) To Preclude Evidence Relating to Whitlock's Transfer of the Project and the TCX Funding (Docket No. 423)

Decision on this motion is deferred.

### 5) To Preclude Expert Opinions Criticizing the Original Design of Construction Elements Where the Expert Conceded No Harm Resulted from that Design (Docket No. 424)

Part of the claim for damages involves remediation of defects in the foundations of the I-buildings. The original design for the I-Buildings, by John Saracco Architects ("JSA"), called for a majority of the foundations to be

5

constructed using pilings. Cmax proposed instead to substitute spread footings. Cmax retained its own structural engineer to design the spread footings for all 29 of the I-Buildings. And ultimately, Cmax constructed spread footings pursuant to its own engineers' recommendations and designs.

Whitlock/Agency want to prevent Arch/Cmax's expert, Mark K. Seel, from testifying regarding deficiencies in the original design for the I-Building piling foundations, and in the underlying geotechnical report. Because the pilings in JSA's drawings were never built, they say, there can be no "causal connection" between JSA's design and the cost of remediating the spread footings that were actually built. Moreover, Seel acknowledged in his deposition that he knew of no delays or deficiencies resulting from flaws in the JSA piling foundation design.

Arch and Cmax counter that Seel established only the design flaws; another expert, L. Lee Schumacher, will establish causation. The causal connection is a bit attenuated, but the argument is something like the following:

1. The original I-Building piling foundation designs were flawed and could not be built.
2. In 2004, the design was therefore switched to spread footings.
3. The new spread footings design had to be approved by the Jersey City Building Department (JCBD).
4. According to one of Arch's experts, Don Erwin, it was JSA's responsibility to secure the approval of JCBD for the foundation design change.
5. On January 31, 2008, JCBD refused to perform any inspections of the I-Buildings until it received and approved new drawings.
6. JSA submitted revised drawings to JCBD in March 2008 and resubmitted them with requested changes in May 2008. JCBD approved those drawings on June 3, 2008.
7. Schumacher will testify that Whitlock is therefore responsible for the 124 days of delay between when the JCBD stopped inspections on January 31, 2008, and allowed inspections to resume on June 3, 2008.

The theory is far from overwhelming. Whitlock, of course, has a legitimate counter-argument that any defects in the original design were not a substantial factor in stopping construction to obtain permits nearly four years later. That causation issue, however, is one for the jury. Seel's testimony potentially provides the first of seven steps in a chain of causation that culminates in the conclusion that some of the delay of which Whitlock

complains is not attributable to Arch/Cmax. I will therefore deny Whitlock's motion *in limine* in this respect. Seel's testimony on this issue (assuming it is elicited first) will be admitted subject to connection by other witnesses. Should that connection fail to materialize, it will be stricken.

Similarly, Whitlock and the Agency have moved to prohibit Don Erwin from testifying that JSA's project specifications were incomplete and deficient because they contained numerous blank spaces. Whitlock and the Agency assert that Erwin's testimony is irrelevant because he could not say how any of these blank spaces created confusion or resulted in improper construction. Arch and Cmax reply that the test of relevancy is broader. Their contention is that JSA failed to exercise the generally accepted standard of professional care in preparing its construction documents, including, but not limited to, drawings and specifications. Evidence tending to show a lack of care therefore meets the low threshold of Rule 401.

This evidence is frankly unimpressive, at least standing alone. But I cannot say that evidence regarding alleged deficiencies in the drawings and specifications is irrelevant. In this respect, too, the motion *in limine* is denied.

### 6) **To Exclude Expert Testimony Related to Claims of Alleged Lack of Supervision (Docket No. 425)**

Whitlock/Agency move to preclude certain testimony relating to Whitlock's alleged failure to oversee the construction project. On May 3, 2013, I granted Whitlock's motion to clarify that Judge Brown's February 8, 2011 opinion remains the law of the case, and that it forecloses the issue that Whitlock failed to properly supervise the project. [Docket No. 477] The motion *in limine* would therefore be properly denied as moot, since I do not expect that such evidence will be offered. In an abundance of caution, however, I will grant the motion.

### 7) **To Exclude as Irrelevant Evidence of Alleged Design Defects (Docket No. 428)**

Arch/Cmax may seek to introduce evidence of design defects for which Whitlock is responsible. This, says Whitlock, is an attempt to invoke *U.S. v. Spearin*, 248 U.S. 132 (1918). Under the *Spearin* doctrine, an owner that has issued design specifications impliedly warrants that they are adequate, and a contractor who faithfully implements them will not be held liable for doing so. According to Whitlock, the *Spearin* doctrine does not apply here, so the design defect evidence is irrelevant.

7

Whitlock argues that the contractor, Cmax, is not absolved under *Spearin* because it has expressly and independently warranted its work and materials. Thus Cmax "guarantee[d] the work to be performed and all materials to be furnished under [the construction contract] against defects in materials, equipment, and workmanship for a period of one (1) year from the date of substantial completion of the last unit under construction." Cmax also "guarantee[d] that during the periods of the guarantees [Cmax] will make good all defects in the work covered." That express warranty by Cmax, says Whitlock, takes this case out of the *Spearin* doctrine because that express warranty is not negated by the Whitlock's implied warranty.

Arch/Cmax make a number of responses. One of them is that the design defects are not relevant only to the *Spearin* doctrine. For example, Arch/Cmax seek to establish that certain design defects caused delays to the project and therefore would tend to absolve Arch/Cmax of responsibility for such delays. That is enough to permit the jury to hear such evidence. Otherwise, the issue appears to be one that should be decided in the context of the record at trial. If and when the time comes, the Court and the parties can address the precise contours of the *Spearin* doctrine, *e.g.*, through jury instructions.

This motion *in limine* is therefore denied.

**Motions *in limine* filed by Arch and Cmax:**

### 8) To Preclude Portions of James Hamje's Testimony (Docket No. 418)

Decision on this motion is deferred.

### 9) To Preclude Whitlock and the Agency from Offering Evidence of Damages Incurred After February 13, 2012 (Docket No. 420)

By order of the Magistrate Judge, discovery was cut off as of February 13, 2012. According to Arch/Cmax, "if the discovery cutoff is to be a fair and meaningful tool for limiting the evidence and issues presentable at trial, the cutoff date of February 13, 2012, must completely circumscribe the universe of facts and damages that may be presented to the jury. Otherwise, Arch and Cmax will be left with their hands tied behind their backs as they attempt to preserve a defense to Whitlock's damages claim." I am not persuaded by this argument.

The thrust of Arch's argument is that, as of February 13, 2012, it was speculative whether completion costs were or would be borne by Whitlock. The

8

court indeed limited trial evidence to *documents created* prior to February 13, 2012." It did not, however, preclude proof of *damages that continued to accrue* after February 13, 2012. It is possible that such damages may be shown through testimony or through documents created and turned over prior to the discovery cutoff. Whitlock seeks damages for project completion costs incurred before the discovery cutoff date, and projected to be incurred after that date. Its claims are based on, *inter alia,* defects discovered before the discovery cutoff date. Such projected damages are no different in principle from a calculation of future damages projected from the date of trial, the date of judgment, or any other date.

The cutoff of discovery – an administrative necessity – does not preclude Whitlock from submitting evidence and expert testimony projecting what their completion costs will or would be. Accepting Arch's theory would in essence disallow *all* calculations of future damages. That is not to say that Whitlock can recover damages that are purely speculative; it cannot. It must, based on documentary and testimonial evidence, establish the extent of completion costs and future damages with the requisite degree of certainty.

The same is true of Whitlock's claim for liquidated damages. Whitlock will be entitled to liquidated damages if it proves its entitlement to such damages with reasonable certainty. To do so, it may rely on documents in Arch's possession that were produced prior to the discovery cutoff.

This motion *in limine* is denied.

### 10) To Preclude Reference to Arch as the "Insurance Company" (Docket No. 426)

Arch seeks to preclude any reference to itself as "the insurance company." Lest it be forgotten, "Arch" is short for Arch **Insurance Company** and Arch **Reinsurance Company**. Those names appear in the caption of the case and on documents; they will doubtless be mentioned many times in the course of the presentation of evidence. Notably, Arch Insurance Company does not contest the right of parties and witnesses to refer to it by its proper name. I fail to see how "the" insurance company is any more prejudicial than "Arch" insurance company.

As its name implies, Arch is in fact a licensed insurance company that offers numerous forms of insurance. Moreover, suretyship is considered a form of insurance. *Highlands Ins. Co. v. Hobbs Group, LLC.*, 373 F.3d 347, 352 (3d Cir. 2004) ("Because it is long settled in New Jersey that surety is insurance,

surety bondholders are equivalent to insurance policyholders.") Arch spills considerable ink explaining the differences between a surety bond and a policy of liability insurance. Those distinctions, however valid, are not meaningfully linked to Arch's claim of prejudice.

Arch's claim of prejudice is a *non sequitur*: "If jurors know that an insurance company will be paying a judgment, they might be reckless in awarding damages to a plaintiff." The jurors inevitably *will* know, if only from Arch's name, that Arch is an insurance company. Will jurors be more (or less) reckless about awarding damages based upon whether they believe a surety, as opposed to an insurer, is paying the judgment? I can imagine no basis for thinking so, and Arch provides none.

This motion *in limine* is denied.

### 11) To Preclude William Wheatley, R.A. from Offering Certain Testimony at Trial (Docket No. 427)

Decision is deferred on this motion.

### Motion *in limine* filed by Deluxe

### 12) To Exclude Evidence of the State of NJ Department of Community Affairs Notice of Violation and Related Documents (Docket No. 417)

On August 2, 2011, the State of New Jersey Department of Community Affairs (the "DCA") issued a Notice of Violation to Deluxe (the "DCA Notice"). The DCA Notice identified an alleged violation of the New Jersey Administrative Procedures of the Industrialized Buildings Commission (the "IBC Procedures"). Without addressing the merits of the DCA Notice, Deluxe argues that any violation of IBC Procedures would not involve a breach of any contractual duty owed by Deluxe. According to Deluxe, its contract with Cmax (the "Deluxe Contract") obligated Cmax -- not Deluxe -- to deliver building plans that complied with building codes so that the modular units could be built. Deluxe argues that the DCA Notice is therefore irrelevant to this breach-of-contract case. In addition, says Deluxe, admission of the Notice may spawn a "trial within a trial" as to validity of the claimed violations.

Whitlock/Agency contend that the DCA Notice nevertheless remains relevant to their damages claims against Arch/Cmax. Deluxe's argument, from the perspective of Whitlock/Agency, is therefore beside the point. Even if Cmax were solely liable, the evidence would be relevant and admissible.

Be that as it may, Arch/Cmax do not accept that the DCA Notice points solely to their liability. They assert that the DCA Notice and related communications are evidence of construction defects, not design issues, and construction was the job of Deluxe. The DCA Notice and related communications allegedly reflect visual site inspections by DCA officials, Jersey City sub-code officials, and Deluxe's own factory inspector. The Notice and those inspections, say Arch/Cmax, suggest construction defects that are attributable to Deluxe.

Although each party contests the relevance of the DCA Notice to its own conduct, each thinks it is relevant to (somebody else's) damages. I find that this DCA Notice is admissible because it is relevant to whether damages were caused by construction defects, design defects, or neither; and whether any such damages are attributable to Arch/Cmax, Deluxe, or neither. Admission of the DCA Notice need not give rise to a mini-trial. The Court and the parties may have to determine the existence, or not, of construction defects in any case. If necessary, the parties may propose limiting instructions to limit the scope of the presentation and avoid confusing the jury as to the proper relevance of the DCA Notice.

This motion *in limine,* too, is denied.

Dated: Newark, New Jersey
September 13, 2013

_____
**KEVIN MCNULTY**
**United States District Judge**

11