UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DELUXE BUILDING SYSTEMS, INC.,** *Plaintiff,* v. **CONSTRUCTAMAX, INC., et al.,** *Defendants.* | **Civil Action No. 06-2996** **OPINION** |

This matter comes before the Court on Defendants Arch Insurance Company and Arch Reinsurance Company's (collectively, "Arch") motion for summary judgment against Plaintiff Deluxe Building Systems, Inc. Dkt. No. 667. A previous motion for summary judgment established Arch's liability to various parties, including Deluxe. Dkt. No. 487. Because the Bond on which Arch's liability is based provides priority to the owners over third party beneficiaries, the Bond is limited to the penal sum, and the penal sum has been expended, the Court **GRANTS** Arch's motion for summary judgment.

I. **BACKGROUND**

This case arises from the construction of a 330-unit mixed-income rental housing project on a historic mill site in Jersey City. The relevant parties are as follows: Whitlock Mills L.P. ("Whitlock") was the owner of the property, Constructamax, Inc. ("Constructamax") was the contractor, Deluxe Building Systems, Inc. ("Deluxe") was a subcontractor, Arch Insurance Company and Arch Reinsurance Company (collectively, "Arch") were the surety, and the New Jersey Housing and Mortgage Finance Agency (the "Agency") was the lender.

On April 23, 2004, Constructamax entered into a construction contract to build a housing project for Whitlock in Jersey City. Arch 56.1 Statement ¶ 1, Dkt. No. 667-1. The contract

1

involved rehabilitation of five existing buildings and construction of twenty-nine new ones. Id. ¶ 3. The new buildings were to be created from over 100 prefabricated modular units, purchased from Deluxe. Id. In November of 2004, Constructamax contracted with Deluxe to purchase those units. Id. ¶ 5. The purchase contract provided Deluxe the right to establish a mechanic lien on the property if it was not paid. Id. ¶ 6.

On May 26, 2004, Arch executed a combined performance and payment bond ("the Bond"), with a penal sum of $34,581,371.00. Id. ¶ 8. This bond named Whitlock and the Agency as co-obligees. Id. The Bond explicitly recites that it is "expressly understood and agreed that the liability of the surety for any and all claims hereunder shall in no event exceed the penal amount of this obligation as herein stated." Id. ¶ 10.

On June 16, 2006, Deluxe terminated the contract due to non-payment. Id. ¶ 7. Also in June of 2006, Constructamax and Whitlock terminated their construction contract. Whitlock then demanded that Arch perform its obligations under the Bond. Id. ¶ 11. Arch negotiated a Takeover Agreement with Whitlock, which they both executed on February 13, 2007. Id.

Arch then retained Constructamax as the completion contractor to help it finish the construction project. Id. ¶ 13. Arch made payments through a construction management firm, Cashin Spinelli & Ferretti LLC ("CSF") while it was trying to complete the project. Id. ¶¶ 14-16. Payments were made to subcontractors, suppliers, and other vendors pursuant to a defined payment procedure by which Constructamax certified to Arch that it had thoroughly reviewed the amount invoiced and that amount was for (1) work that was performed according to contract specifications, or (2) materials received or which would be received for use on the Whitlock Mills Project. Id. ¶ 17. CSF reviewed the Constructamax certifications, made any necessary adjustments, and then presented payment requests to Arch. Id. ¶ 18. There were 33 such payment requests during the

Case 2:06-cv-02996-MCA-MAH Document 693 Filed 08/01/16 Page 3 of 13 PageID: 28315

takeover period. Id. ¶ 18. After CSF submitted a payment request, Arch would pay them by electronically transferring the total sum of each request to the CSF account, from which disbursements were made. Id. ¶ 19. Vendors were generally required to certify that the work or materials were provided to the Whitlock Mills Project before they were paid. Id. ¶ 20. The procedure used by CSF to verify payments is standard in the business of construction management for ensuring that payments are proper and contribute to the completion of that project. Id. ¶ 21.

These payments through CSF equaled $14,370,204.54.[1] Id. ¶ 15. Arch also paid Constructamax $2,913,037.01 for labor, supervision, and payroll costs connected to the project. Id. ¶ 22. Arch paid CSF $2,640,876.05 for construction management services on the project. Id. ¶ 24. Arch paid $630,000 to Deluxe for delivery of prefabricated modular units. Id. ¶ 25. Arch spent at least $514,713.36 to pay other subcontractors, suppliers, and vendors in connection with the project. Id. ¶ 26. Arch received payments and recovered salvage worth $2,820,212.28, offsetting the amount spent by it. Id. ¶ 27. Arch thus made net expenditures of $18,248,618.68 in connection with its attempt to complete the Project. Id. ¶ 28.

This lawsuit initially involved Arch, Whitlock, the Agency, Constructamax, and Deluxe. The procedural history is extensive, but only one prior decision directly affects the current dispute. On September 5, 2013, Judge Kevin McNulty held that Arch's liability may exceed the penal sum of the Bond to the extent Arch was liable for its breach of the subsequent Takeover Agreement. Dkt. No. 487 at 8-9 ("[T]he amount of the bond does not limit the damages that may be assessed

---

[1] Deluxe denies this contention for the purposes of trial, but does not identify any evidence raising a genuine dispute of material fact as to this question and does not dispute this contention "for the purposes of this Motion." Deluxe's Response to Arch's 56.1 Statement ¶¶ 15-16. In several other areas, Deluxe uses the same confusing statement in response. This is not a valid denial.

against Arch for breach of contract as a result of Arch's having entered into the Takeover Agreement.").

Subsequently, Arch paid $27 million to Whitlock and the Agency in a settlement between Arch, Constructamax, Whitlock, and the Agency. Id. ¶ 34. The Settlement Agreement recites that

> Arch's payment of the Settlement Payment is made by Arch in the discharge of its obligations as surety under the Bond to Whitlock and the Agency, as co-obligees under the Bond, in payment of the claims of Whitlock and the Agency under the Bond, and Whitlock and the Agency accept the Settlement Payment as such.

Id. ¶ 36. The Settlement Agreement later states that

> As Arch is making payment of the Settlement Payment in the discharge of its obligations as surety under the Bond in satisfaction of the claims of Whitlock and the Agency under the Bond, Arch's payment of the Settlement Payment further reduces the penal sum of the Bond by the full amount of the Settlement Payment with the result that, upon payment of the Settlement Payment, Arch will have expended the full penal sum of the Bond and that the Bond shall thereby be fully extinguished and shall become null and void.

Id. ¶ 37.

Under the instant motion, Deluxe claims that it is owed money by Arch. Arch moves for summary judgment because Whitlock and the Agency have priority under the Bond, Arch's liability under the Bond is limited to the penal sum, and that sum has been expended. The Court agrees with Arch for the reasons explained below.

## II.   LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may

be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

**III.   ANALYSIS**

### A. The Agency and Whitlock Have Priority Under the Bond

Deluxe argues that it is entitled to pro rata distribution of the Bond sum, because it is a third-party beneficiary under the Bond. Central to this dispute is the question of whether Whitlock and the Agency (the Obligees) had priority under the Bond or were in equal stead with Deluxe (a subcontractor).

As a contract, the Bond is controlled by the rules of contract interpretation. "The paramount goal of contract interpretation is to determine the intent of the parties." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 587 (3d Cir. 2009) (citation and internal quotation marks omitted). Courts are to consider "not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." Id. at 582. "The strongest objective manifestation of intent is the language of the contract." Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 76 (3d Cir. 2011). "If the words of the contract are capable of more than one objectively reasonable interpretation, the words are ambiguous." Id.

The Bond in this case is a joint payment and performance bond, meaning that Arch must complete the project and pay claims up to a certain amount. The text of the Bond does not explicitly discuss priority. However, portions of the construction contract, which the Bond incorporates,[2] imply that the owner may receive priority. The construction contract identifies the

---

[2] Deluxe agrees that the construction contract was incorporated into the Bond. See Opp. Brief at 31 n.45, Dkt. No. 679.

5

Bond as an "assurance of completion." Arch's 56.1 Statement ¶¶ 1, 8, 10. The owner and lender are the entities who gain from completing the project. Similarly, the construction contract provides that 100% of the contract price may go to completing the project, id., which means all benefits of the Bond would accrue to the owner and lender, not the subcontractors.[3] Finally, the construction contract refers to the Agency as the Lender. See Cert. of Wallace Scruggs Ex. B, Construction Contract art. 3, Dkt. No. 551-7. Lenders frequently receive priority (though the text here does not so provide). On the other hand, the Bond contemplates that subcontractors may make claims under it: the parties "agree[] and assent[] [that] this undertaking shall be for the benefit of any subcontractor . . . . as well as for the Obligee." Id. art. 29. Subcontractors are undoubtedly beneficiaries under the Bond, but their relative priority to the Obligees is unclear. Though the text of the Bond implies owners and lenders have priority, it is ambiguous. The Court therefore reviews context, form, and intent underlying the Bond to determine its meaning.

The Restatement (First) of Security § 167[4] establishes the default rule that owners should be given priority in construction contracts containing promises:

> Where in a construction contract a surety is liable both to an owner-promisee and to those furnishing labor and materials, and the amount for which he is liable is insufficient to satisfy all claims, the fund available shall be used to satisfy the claims of his promisee before the claims of those furnishing labor or materials, unless a statute requires otherwise or unless the claims of the latter must be satisfied first in order to avoid circuity of action.

---

[3] That the Bond extends to both performance of the contract and security for payment of persons performing labor or providing materials to the contract does not itself address whether certain beneficiaries are given priority or not.

[4] The Restatement of Security has not received a subsequent edition. Discussions of suretyship were addressed in the Restatement of Suretyship and Guarantee (Third), but these discussions did not include the topic discussed in the Restatement (First) of Security § 167. Deluxe does not point to any language in subsequent Restatements discounting § 167, while Arch claims this was likely overlooked due to the contemporary rarity of joint performance and payment bonds.

This case cleanly falls under the Restatement. This is a construction contract wherein a surety made promises to finish the project and pay up to the penal sum. By default, then, the owner has priority.

The practical goals of a joint payment and performance bond support giving priority to the owner. A performance bond ensures the completion of a construction project. If a joint payment and performance bond did not provide priority to the owner, however, the obligor could never undertake to complete the project without potentially exceeding the penal sum. The only way to ensure protection of the penal sum would be to interplead the entire amount. But this would prevent completion of the project—the central purpose in choosing a joint performance and payment bond, rather than merely a payment bond. Thus, the purpose of the Bond indicates that the owner has priority over third-party beneficiaries like Deluxe.

The form of the Bond also indicates it gives priority to the owner. The Bond's form was dictated by the Agency and is very similar to bonds required under the former public works bond act, N.J. Stat. Ann. § 2A:44-147. The construction contract recites that the form shall be that "prescribed in N.J.S.A. 2A:44-147. . . ." Cert. of Wallace Scruggs Ex. B, Construction Contract art. 29. For bonds issued under that statute and in that form, New Jersey courts recognized that "[t]he bond is required primarily for the benefit of the public agency or body for which the work is being done and secondarily for the benefit of materialmen and subcontractors and others whose labor or materials go into the performance of the contract." Samuel Braen's Sons v. Fondo, 52 N.J. Super. 188, 191 (App. Div. 1958); see also Newman v. Maryland Cas. Co., 112 N.J.L. 122, 126 (Ct. App. 1934). The form of the Bond therefore indicates priority should be given to the owner.

Deluxe cites to several cases which impose pro rata liability on a surety above the penal sum of a bond, when that surety settles with one among several claimants. See Am. Surety of New York v. Mills, 232 F. 841, 843-44 (9th Cir. 1916) (surety who pays one claim knowing there is another outstanding claim from an equal obligee may be liable for additional pro rata payment); Commonwealth v. City Tr., S. Dep. & Sur. Co., 224 Pa. 223, 73 Atl. 425 (1909) (same). However, these cases concern only payment bonds with no performance requirement. As such, the Restatement (and the practical consequences of failing to give priority on a performance bond) do not apply to those cases. Neither Arch nor Deluxe identify cases concerning joint performance and payment bonds.

Because of (1) language implying that the Bond provides priority to the owner and lender, (2) the Restatement identifying a baseline rule that owners should be given priority in the context of performance bonds, (3) practical consequences of failing to give such priority for a performance bond, and (4) the form of the Bond, the Court holds that this Bond provides priority to the owners, here Whitlock and the Agency.

### B. Bond Limited to the Penal Sum

The next question is whether the Bond is limited to the penal sum of $34,581,371 or not. Deluxe argues that Judge McNulty already ruled that Arch's liability was not limited to the penal sum. The Court disagrees and holds the Bond is limited.

"'It has long been settled law that a surety is chargeable only according to the strict terms of its undertaking and its obligations cannot and should not be extended either by implication or by construction beyond the confines of its contract." Eagle Fire Prot. Corp. v. First Indem. of Am. Ins. Co., 145 N.J. 345, 356 (1996) (quoting Monmouth Lumber Co. v. Indem. Ins. Co. of Am., 21 N.J. 439, 452 (1956)).

The Bond explicitly limits liability under it to the penal sum: it is "expressly understood and agreed that the liability of the surety for any and all claims hereunder shall in no event exceed the penal amount of this obligation as herein stated." Arch 56.1 Statement ¶ 10.

Judge Kevin McNulty concluded that he could not find that Section 10 of the Takeover Agreement limited Arch's liability "for its own breaches of the contractual performance obligations it separately undertook in the Takeover Agreement." Dkt. No. 487 at 10-11. Judge Esther Salas similarly ruled that "a genuine issue of material fact exists as to whether Arch's liability can exceed the limit of the penal sum of the bond." Dkt. No. 383 at 8. The law of the case, Deluxe argues, prevents limiting Arch's liability to no more than the penal sum of the Bond. But both those rulings were explicitly tied to the Takeover Agreement, to which Deluxe was not a party, and under which Deluxe does not raise any claims. Deluxe's only claims against Arch stem from the Bond. The plain language of the Bond therefore controls, and the claim is limited to the penal sum.

Deluxe finally argues that Arch's payments beyond the penal sum of the Bond "is an admission that it has liabilities under other theories." This argument fails. There are myriad reasons to settle above one's expected liability, including legal costs and risk tolerance. Such a settlement is in no way an admission that liability extends beyond the penal sum of the Bond.

### C. The Penal Sum Has Been Exhausted

Arch has presented evidence showing that it made expenditures exhausting the penal sum of the Bond. Specifically, Arch has presented evidence that it paid $18,248,618.68 in good faith to complete the project. Arch also presented evidence that it paid $27 million under the Bond in settlement to Whitlock and the Agency. This totals over $45 million, almost $10.5 million more than the penal sum of the Bond.

Deluxe argues that it requires discovery into the negotiation of the settlement agreement to determine whether the settlement agreement actually contributes to the penal sum, despite the settlement agreement's recitation that it does. The Court has already denied such discovery, which would be futile in any event. For one, evidence of the settlement discussions is inadmissible "to prove or disprove the amount or validity of any claim." Fed. R. Ev. 408. Representations by the parties as to how much settlement money ought to be allocated where would be inadmissible to show the amount underlying claims under the Bond, Takeover Agreement, or anything else. The settlement agreement explicitly states that it is entered into to pay off liability under the Bond:

> Arch's payment of the Settlement Payment is made by Arch in the discharge of its obligations as surety under the Bond to Whitlock and the Agency, as co-obligees under the Bond, in payment of the claims of Whitlock and the Agency under the Bond, and Whitlock and the Agency accept the Settlement Payment as such.
> . . . .
> As Arch is making payment of the Settlement Payment in the discharge of its obligations as surety under the Bond in satisfaction of the claims of Whitlock and the Agency under the Bond, Arch's payment of the Settlement Payment further reduces the penal sum of the Bond by the full amount of the Settlement Payment with the result that, upon payment of the Settlement Payment, Arch will have expended the full penal sum of the Bond and that the Bond shall thereby be fully extinguished and shall become null and void.

See McNaughton Cert Ex. K, Settlement Agreement ¶¶ 2.3-2.4. No evidence counters that representation.

Even if some of the settlement was allotted to the Takeover Agreement, it would still deplete the Bond. The Takeover Agreement recites that the Bond "shall be deemed to have been reduced by the amounts of any such payments made by Surety" under the Takeover Agreement.

James Ferucci Cert. Ex. C, Takeover Agreement art. 10 at 17, Dkt. No. 591-6.[5] Deluxe argues that prejudgment interest does not count towards reducing the penal sum of the Bond. However, Deluxe provides no citation supporting this claim, even though such prejudgment interest would stem from liability under the Bond (or the Takeover Agreement, payments under which deplete the Bond). And there is no evidence that prejudgment interest in this settlement accounts for more than $10 million of the $27 million settlement.[6] Finally, the Court notes that all the claims in this case stem from the same factual nucleus—Arch's entry into the Bond and attempts to fulfill it.

Deluxe argues that some of the payments made to complete the project were defective. To support this, Deluxe points to the fact that Whitlock and the Agency previously challenged the payments and to an unsworn expert report from Wheatley, who is now retained by Arch, which indicates that some of the payments to complete the project were defective. But there is no evidence in certifications or sworn statements raising any genuine dispute of material fact as to defects in any of Arch's payments or the work performed on Arch's behalf.[7]

Deluxe further argues that bond exhaustion is an affirmative defense which Arch must prove. But Arch has proven it with evidence of $18,248,618.68 in payments made to complete the project and a $27 million settlement payment under the Bond. The burden to produce some evidence disputing material facts concerning bond exhaustion shifted back to Deluxe, and Deluxe

---

[5] This is consistent with Judge McNulty's opinion that the penal sum does not limit the amount to which Arch may be liable under the Takeover Agreement. Payments under the Takeover Agreement diminish the Bond's penal sum, but theoretically may exceed the Bond's penal sum.

[6] Any reduction in the settlement agreement of less than approximately $10.5 million would still leave the penal sum of the Bond exhausted, since, as discussed below, there is no evidence that any of the $18,248,618.68 spent to complete the project was defective.

[7] Deluxe argues that it would have retained Wheatley if given the chance. Perhaps so. But this is a ten-year-old case and Deluxe has the burden to support its claims. It has presented no admissible evidence showing that work on the project was defective. The Court therefore cannot credit its unsupported assertion that some of the work should not be counted.

did not produce any such evidence. As a result, summary judgment that the penal sum has been exhausted is appropriate.

### D. Equitable Lien

Deluxe also argues that it has an equitable lien on any funds paid to Constructamax. Arch replies that Deluxe has never asserted that claim in its pleadings, and that Deluxe has an adequate remedy at law—the right to assert a mechanics lien on the property pursuant to N.J.S.A. 2A:44-1 et. seq.—which it chose not to invoke, so it cannot now rely on equitable relief. See Wood v. N.J. Mfrs. Ins. Co., 206 N.J. 562, 578 (2011) ("New Jersey traditionally has deemed it 'elemental that . . . equitable processes are available only to the party who cannot have a full measure of relief at law,' and that it is '[t]he lack of an adequate remedy at law [that forms] the basis of the appeal to equitable jurisdiction [.]'") (quoting Bolte v. Rainville, 138 N.J. Eq. 508, 512, 48 A.2d 191 (E. & A. 1946)). The Court agrees. An equitable lien here is barred based upon the existence of an adequate remedy at law, which Deluxe did not elect to use.

Even if the claim were valid, the Court would not allow amendment at this late date. Laches bars Deluxe's claims, due to Deluxe's awareness of this claim and refusal to bring it over ten years of litigation. See Lavin v. Bd. of Educ. of City of Hackensack, 90 N.J. 145, 152 (1982) (citations omitted) ("The length of delay, reasons for delay, and changing conditions of either or both parties during the delay are the most important factors that a court considers and weighs . . . . The length of the delay alone or in conjunction with the other elements may result in laches."). This case is ten years old. Deluxe was adverse to Constructamax and Arch throughout the litigation, and sought damages from both of them. Any claim for an equitable lien could have been brought much earlier in this litigation. This claim is therefore barred by laches.

## IV. CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of Arch. An appropriate order accompanies this opinion.

Date: August 1, 2016               /s/ *Madeline Cox Arleo*            .
                                   **Hon. Madeline Cox Arleo**
                                   **UNITED STATES DISTRICT JUDGE**